# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

KATHY JEAN JOHNSON,

Plaintiff,

v.                                          6:16-CV-180
                                            (ATB)
COMMISSIONER OF SOCIAL SECURITY,

Defendant.

CHRISTOPHER CADIN, ESQ., for Plaintiff
FERGUS J. KAISER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y.G.O. # 18, in accordance with the provisions of 28 U.S.C. § 636 (c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 2, 4, 8).

## I.  PROCEDURAL HISTORY

On July 1, 2009, plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits ("DIB") and a Title XVI application for Supplemental Security Income ("SSI"), alleging disability beginning May 29, 2009. (Transcript ("T") at 112-19, 120-26, 180).  The applications were denied initially on October 22, 2009, and plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (T. 22, 60-66, 68). A hearing was held on January 18, 2011, before ALJ Elizabeth W. Koennecke. (T. 31-47).  Plaintiff appeared and testified in Utica, New

York.[1]  On March 18, 2011, ALJ Koennecke found that plaintiff was able to perform her previous work and was not disabled. (T. 22-30, 658-66 (duplicate)).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review of the ALJ's decision on June 14, 2012. (T. 1-4).

Plaintiff appealed the Commissioner's final decision to the United States District Court for the Northern District of New York, and on November 21, 2013, the Court reversed the June 14, 2012 decision and remanded the case to the agency for further proceedings. (T. 674, 675-91).  On remand, by order dated March 27, 2014, the Appeals Council sent plaintiff's case back to ALJ Koennecke for a new hearing and decision. (T. 694-95).  The Appeals Council also noted that the plaintiff had filed a subsequent application for SSI benefits on July 20, 2012, which resulted in an initial denial and an unfavorable decision on December 2, 2013, after a hearing before ALJ Julia Gibbs. (T. 694, 700-710).  The Appeals Council ordered ALJ Koennecke to consider reopening the "subsequent unfavorable decision as appropriate."[2] (*Id.*)  ALJ Koennecke was directed to "offer the claimant the opportunity for a hearing," and was ordered to "address the additional evidence submitted, take any further action needed to complete the administrative record, and issue a new decision." (T. 695).

ALJ Koennecke held a video hearing on October 29, 2014 and a supplemental

---

[1] The first paragraph of the hearing transcript states that the hearing was held in Syracuse, while the second paragraph states that the hearing was held in Utica. (T. 33). The ALJ's decision specifically states that the hearing was held in Utica. (T. 22). The location of the hearing is not relevant to the decision.

[2] "Reopening" is appropriate if the claimant is asking to review a decision that has already become final, but that the claimant failed to challenge within the stated time period for a direct challenge. 20 C.F.R. §§ 404.987-404.989, 416.1487-416.1489.

hearing on September 1, 2015. (T. 624-47, 648-54). Plaintiff testified at the October 29th hearing, and Vocational Expert ("VE") Christine Ditrinco testified at both hearings.[3] On September 25, 2015, ALJ Koennecke issued another unfavorable decision, finding that, although plaintiff was unable to perform her previous work, she could engage in occupations that existed in substantial numbers in the national economy. (T. 717-29). On November 5, 2015, the Appeals Council notified the parties that it was reviewing ALJ Koennecke's September 25, 2015 decision on "own motion"[4] review based upon an error of law by the ALJ.[5] (T. 878-81). On January 17, 2016, the Appeals Council issued a written decision, "consolidating" plaintiff's claims filed on "July 1, 2009 and July 20, 2012." (T. 609-12).

The Appeals Council adopted the ALJ Koennecke's ultimate determination that plaintiff was not disabled and adopted her determination at steps one, two, and three of the sequential evaluation. (T. 610). However, the Appeals Council specifically disagreed with ALJ Koennecke's finding at step four of the sequential evaluation that plaintiff was not capable of performing her past relevant work. (*Id.*) The Appeals Council also noted that, when it remanded the case to ALJ Koennecke to determine whether to "reopen" the subsequent ALJ's decision dated December 2, 2013, the

---

[3] The September 1st hearing was held in order to allow the plaintiff's representative to ask the VE additional questions. (T. 648-54).

[4] 20 C.F.R. §§ 404.969, 416.1469.

[5] The regulations provide that the Appeals Council will review a case on its own motion in five circumstances: (1) the ALJ abused his or her discretion; (2) there is an error of law in the ALJ's decision; (3) the findings of the ALJ are not supported by substantial evidence; (4) there is a "broad policy or procedural issue that may affect the general public interest;" and (5) if new and material evidence is submitted. 20 C.F.R. §§ 404.970(a)(1)-(a)(4) and 404.970(b), 416.1470(a)(1)-(a)(4) and 416.1470(b).

Appeals Council was "unaware" that plaintiff had also filed a request for review of ALJ Gibbs's decision. (T. 610). Because plaintiff had filed a request for review of ALJ Gibbs's December 2, 2013 denial, there was no need to "reopen" the 2012 application.

The Appeals Council noted that ALJ Koennecke's opinion did not specifically address ALJ Gibbs's December 2, 2013 decision, in which the ALJ Gibbs found that plaintiff did not have a severe mental impairment and had the RFC to perform her past relevant work. (T. 610). The Appeals Council then "associated" the plaintiff's request to review the December 2, 2013 decision with "the case file remanded by the district court," together with ALJ Koennecke's September 25, 2015 denial. (*Id.*)

The Appeals Council reviewed the two ALJs' decisions and determined that ALJ Koennecke should not have felt "compelled" by the District Court's order[6] to limit plaintiff to "unskilled" tasks because this finding was "inconsistent with the findings of 'no' to 'mild' limitations that ALJ Koennecke found when reviewing the case under the "special technique."[7] (T. 610). Accordingly, the Appeals Council found (as ALJ Koennecke found in her original decision), and as ALJ Gibbs found in her December 2, 2013 decision, that plaintiff was not disabled at step four of the sequential evaluation because she could perform her past relevant work, notwithstanding her severe physical impairments. (T. 611-12). The Appeals Council decision became the final decision of the Commissioner, and plaintiff filed this timely federal court action.[8]

---

[6] The Appeals Council stated that "the District Court did not direct the [ALJ] to limit the claimant to unskilled tasks . . . ." (T. 610).

[7] 20 C.F.R. §§ 404.1520a, 416.920a.

[8] When plaintiff filed the complaint in this action, she was pro se. (Dkt. No. 1). According to the court's standing order, the plaintiff is required to file her memorandum of law first. However,

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the

---

because of plaintiff's pro se status, the court ordered the defendant to file her memorandum of law first. After the defendant filed a memorandum of law, plaintiff obtained counsel, and plaintiff's counsel filed a memorandum of law on December 22, 2016.  The case is now ready for this court's review.

[Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

At the time of ALJ Koennecke's October 29, 2014 hearing, plaintiff was 57 years old. (T. 625). The ALJ questioned plaintiff about her mental impairment. Plaintiff testified that the "symptoms" of her depression were "panic attacks, isolation, [and] feelings of hopelessness." (T. 626). She testified that her memory was "so bad," and she could not remember exactly what year she began going to Mental Health Connections ("MHC") for treatment, but at the time of the hearing, she had returned to MHC for her therapy. (T. 626-27).

Plaintiff testified that between 2010 and 2012, she had suicidal thoughts, and had trouble leaving her home. (T. 627). She told the ALJ that she would not leave her home unless she had an appointment – once per week or once every two weeks. (*Id.*) Plaintiff testified that the providers at MHC gave her "therapy exercises" so that she would be able to leave her home. The "therapy exercises" consisted of plaintiff keeping a journal

in which he wrote down her daily "feelings." She stated that they "talked" about medication, but it was never prescribed because she "stopped going." (T. 627-28).

Plaintiff stated that she had been living in subsidized housing for seven years, and that, in order to live in her apartment, she had to "qualify as disabled." (T. 628). She was required to submit a "medical form" as proof. (T. 628-29). Plaintiff testified that from 2010 until the time of the hearing, she also had "back problems." (T. 629). Her back problems prevented her from "long-term" sitting, standing, and walking. (T. 630). She stated that her back problems had gotten worse since 2012, that she had lost mobility, and that "it" could "just give out" unexpectedly when she stood up. (*Id.*)

Plaintiff stated that she never knew how long her back pain was going to last, and the intensity would vary from a "five . . . up to a ten." (*Id.*) Plaintiff stated that she also had pain in her hips and knees, but she had a difficult time remembering which medical professionals she saw for her particular impairments. (T. 631). In response to questioning by the ALJ, plaintiff agreed that her pain affected her "concentration," although she needed prompting from the ALJ regarding what she meant. (T. 633). Plaintiff stated that the pain affected "anything that required a lot of thought" and affected her ability to "pay attention." (*Id.*)

Plaintiff described her prior work as a customer service representative for Met-Life. (T. 633-34). She stated that she spent the majority of her time sitting, "with the exception of lunch and breaks." (T. 634). Her duties included "servicing [plans]," sitting at the computer, receiving calls, and inputting information. (*Id.*) Plaintiff stated that she could not perform the customer service job because of the "long-term sitting," even if she was given the option to alternate between sitting and standing. (*Id.*)

Plaintiff stated that the pain and her medication "side effects" would interfere with her ability to work. (T. 634-35). Plaintiff stated that her medications caused nausea, sleepiness, headaches, and some dizziness. (T. 635).

Plaintiff stated that she left the Met-Life job when she began having pain, she was diagnosed with back problems, and she began missing work due to her impairment. (*Id.*) Plaintiff stated that she initially got "disability" from the company, but after she exhausted all her disability, she quit her job because she could not return to work. (*Id.*) Plaintiff was then asked to describe all her prior work for the VE Christine Ditrinco.[9] (T. 638-39). VE Ditrinco then described each of plaintiff's prior jobs in terms of the vocational requirements contained in the Dictionary of Occupational Titles ("DOT"). (T. 639). The ALJ Koennecke then asked the VE a hypothetical question which took into consideration plaintiff's age, education, prior work experience, and plaintiff's physical limitations for sedentary work. In addition, the ALJ limited plaintiff to the "mental demand[s] of unskilled work at the lower levels of semi-skilled." (T. 640).

In response to the first hypothetical question, based on the addiional mental limitation, the VE testified that plaintiff could not perform her previous work, but could perform other jobs in the national economy. (T. 641-42). The ALJ then added a requirement that plaintiff be able to alternate sitting and standing every hour. (T. 642). The VE testified that, even with the additional limitation, plaintiff would still be able to do all three jobs that the VE proposed after the first hypothetical. (*Id.*) Plaintiff's attorney asked the VE to assume that the plaintiff would have "occasional" problems with attention and concentration and would be "absent" more than three times per

---

[9] The transcript mistakenly refers to the VE as Christine "Dadrinkle." (*See e.g.* T. 637).

month. (T. 644).  The VE testified that no more than "one day per month would be tolerated." (T. 646).

After the October hearing, plaintiff's representative reviewed the jobs proposed by the VE, and noted that some of them required "transferable skills," which would have been inconsistent with an individual who was limited to "simple" tasks. (T. 652). Plaintiff's representative asked for a supplemental hearing to further question the VE. (T. 650).  The ALJ granted the request and convened a hearing on September 1, 2015. (*Id.*)  Counsel asked some further questions, assuming that plaintiff was limited to "simple" tasks. (T. 652).  The VE testified that she still believed that plaintiff could perform the jobs that she discussed at the October 29, 2014 hearing. (*Id.*)  However, the VE also stated that if the plaintiff were to be "off-task" thirty percent of the day, it would "disqualify" her from any full-time competitive work. (T. 653).

## IV.   THE ALJ'S SEPTEMBER 25, 2015 DECISION

The ALJ began by noting that plaintiff was seeking disability from May 29, 2009, but stated that res judicata required dismissal of cases involving the same parties, issues, and facts as were involved in a previous application. (T. 717).  Plaintiff filed a previous application for both DIB and SSI dated June 28, 2006. (T. 51).  Plaintiff's 2006 application resulted in a denial of benefits after a hearing before ALJ F. Patrick Flanagan. (T. 51-57).  ALJ Flanagan's decision was dated June 2, 2009. (T. 57). Plaintiff apparently did not appeal ALJ Flanagan's decision.  Thus, plaintiff's period of disability could not begin prior to June 3, 2009, unless ALJ Koennecke "reopened" the 2006 application.  ALJ Koennecke stated that a previous final determination may be "reopened" in certain circumstances. (T. 717-18).  The ALJ then considered whether to

10

reopen the 2006 application, but determined that plaintiff had not met the standard for

reopening, and thus found that res judicata applied to prevent the ALJ from addressing

disability prior to June 3, 2009, the date of ALJ Flanagan's decision.[10] (T. 718)

The ALJ found that plaintiff met the insured status for DIB through December

31, 2009 and had not engaged in substantial gainful activity since May 29, 2009. (T.

720). The ALJ found that plaintiff had the following severe impairments: degenerative

disc disease of the lumbar spine, bilateral knees, and hips. (T. 721). In addition, the

ALJ found that plaintiff had the following "non-severe" impairments: hiatal hernia,

gastroesophageal reflux disease, and medically determinable mental impairments. (*Id.*)

However, the ALJ found that none of plaintiff's non-severe impairments would impose

"more-than-minimal" limitations on the plaintiff's ability to perform basic work

activities. Finally, ALJ Koennecke found that plaintiff also had "nonmedically

determinable impairments:" scleroderma[11] and Raynaud's Disease[12] in her hands. (T.

---

[10] Plaintiff's brief contains a footnote, stating that plaintiff had requested reopening of the prior application, and that "significant relevant and material evidence was obtained" after June 2, 2009 that was presented to ALJ Koennecke and the Appeals Council. (Pl.'s Br. at 2 n.5). Plaintiff notes that ALJ Koennecke "denied reopening," and that "[g]ood cause for reopening has been shown." However, the denial of a request to reopen is not subject to further review, absent a colorable constitutional claim. *Califano v. Sanders*, 430 U.S. 99, 108 (1977); *Waldbillig v. Chater*, No 95-CV-1851, 1997 WL 3252, at *2 (N.D.N.Y.) (citing 20 C.F.R § 404.903(1) (1995)) (Rep't-Rec), *adoped*, 1997 WL 3252 (N.D.N.Y. Jan. 3, 1997). Plaintiff is not referring to "good cause" or "new and material evidence" that was presented to the district court in support of a sentence six remand. 20 U.S.C. § 405(g). In any event, plaintiff does not elaborate on this statement, there is no case law or further explanation, and the Appeals Council did not mention this argument in its decision. Thus, the court does not consider the "denial of reopening" of plaintiff's 2006 application a specific issue in this case.

[11] Scleroderma is a group of rare disorders that involve the tightening of the skin and connective tissue. http://www.mayoclinic.org/diseases-conditions/scleroderma/home/ovc-20206014.

[12] Raynaud's Disease causes some of the areas of the body, such as fingers and toes, to feel numb and cold in response to cold temperatures or stress. http://www.mayoclinic.org/diseases -conditions/raynauds-disease/basics/definition/con-20022916. Smaller arteries, supplying blood to the

723).

With respect to plaintiff's "mental impairments,"[13] the ALJ found that they would not cause more-than-minimal limitations on plaintiff's ability to perform basic mental work activities. (*Id.*) The ALJ found that plaintiff had no limitation in the activities of daily living, only mild limitation in social functioning, no limitations in concentration, persistence, or pace and no episodes of decompensation. (T. 722). The ALJ commented that the "diagnosis" of a mental impairment was of "no real consequence," rather the issue was how the impairment affected plaintiff's "mental functioning." (*Id.*) The ALJ then stated that she found no evidence of a "severe" mental impairment in all the medical evidence. (T. 722-23). The ALJ also found that plaintiff's "problems" with her hands and the scleroderma were "undiagnosed," and there was no evidence to support any functional restrictions based on these alleged impairments. (T. 723).

At step three of the sequential analysis, the ALJ found that plaintiff did not have a Listed Impairment, considering Listings 1.02 (Major Dysfunction of a Joint) and 1.04 (Major Dysfunction of the Spine). (*Id.*) At step four of the disability analysis, the ALJ found that plaintiff had the RFC for less than the full range of sedentary work. Plaintiff could lift and carry up to ten pounds occasionally and less than ten pounds frequently; sit for six hours in an eight-hour workday; stand/walk for two hours in an eight-hour day; and push/pull without limitation beyond those imposed on lifting and carrying. (*Id.*) Plaintiff could perform occasional twisting at the waist. She retained the ability to understand and follow simple instructions and directions; perform simple tasks with

---

skin narrow, limiting blood circulation to the affected areas. *Id.*

[13] The mental impairments were listed as "anxiety and depression." (T. 721).

supervision and independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to, and interact appropriately with others to the extent necessary to perform simple tasks; and handle levels of simple, repetitive work-related stress, making occasional decisions directly related to the performance of simple tasks in a position with "consistent job duties" that does not require the plaintiff to supervise or manage the work of other people. (T. 723-24).

In making the above RFC determination, the ALJ took plaintiff's alleged symptoms into consideration, but found that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible. (T. 724). The ALJ cited to objective medical evidence, indicating that plaintiff's examinations revealed normal range of motion, gait, and strength. (*Id.*) Furthermore, the ALJ stated that plaintiff described daily activities that were not limited to the extent that one would expect, given her complaints of disabling symptoms and limitations. (T. 725). The ALJ discussed the weight that she gave to various medical sources. (T. 725, 726).

The ALJ specifically mentioned the District Court's order to "consider non-severe mental limitations in the residual functional capacity . . . ." (T. 726). The ALJ pointed out that the Agency has instructed that "there should be no limit in the residual functional capacity found for a singular mental impairment that does not impose any functional limitations. It is unclear how a mental impairment can be viewed in combination with the physical limitations since there are no mental limits." (*Id.*) After making this statement the ALJ stated that she felt "compelled" by the court's order to consider the non-severe mental impairment and accordingly limited plaintiff to

unskilled mental demands "to address any (unfounded) report of anxiety or workplace pressure issues." (*Id.*) (parenthetical in original).

ALJ Koennecke found that plaintiff could not perform her previous work. However, based on the relevant factors, including the VE's testimony, and plaintiff's acquisition of transferable work skills from her previous job, plaintiff could perform other work which existed in significant numbers in the national economy. (T. 726-27). The ALJ found that plaintiff could perform the jobs of identification clerk, data examination clerk, and appointment clerk. (T. 727-28). Therefore, the ALJ found that plaintiff was not disabled. (T. 728-29).

## V.    THE APPEALS COUNCIL DECISION

As stated above, the Appeals Council reviewed ALJ Koennecke's September 15, 2015 decision on its own motion to correct a perceived error of law, consolidating this review with the requested review of ALJ Gibbs's December 2, 2013 decision. (T. 609). The Appeals Council issued a "combined decision" on January 7, 2016. (T. 609-612).

The Appeals Council adopted "most of" ALJ Koennecke's findings. The Appeals Council adopted the ALJ Koennecke's "B" criteria findings, and then determined that plaintiff had the RFC to perform sedentary work, but she had to have the option to alternate sitting and standing at will.[14] (T. 611). With respect to plaintiff's mental impairment, the Appeals Council found that her "non-severe" mental impairment "results in a limitation that she is unable to perform complex tasks and duties," but that "she retains the mental capacity to perform detailed work related tasks

---

[14] This was a finding made by ALJ Gibbs, but not ALJ Koennecke. (*Compare* T. 723 (Koennecke) *with* T. 705 (Gibbs)).

and duties . . . consistent with semi-skilled work." (*Id.*)  The Appeals Council found that this determination would be "consistent" with the District Court's order.  The Appeals Council adopted all of ALJ Koennecke's other findings, including those with respect to plaintiff's credibility, and determined that plaintiff could perform her former work as a customer service representative. (*Id.*)  The Appeals Council's January 7, 2016 "combined" decision is the final decision of the Commissioner from which plaintiff appeals to this court.

## VI.  ISSUES IN CONTENTION:

Plaintiff makes the following claims:

(1)    The mental status findings of the Appeals Council are inaccurate and beyond the scope of the evidence. (Pl.'s Br. at 15-17) (Dkt. No. 19).

(2)    Plaintiff is not able to return to her past relevant work. (Pl.'s Br. at 17-20).

(3)    The ALJ failed to develop or consider the record based upon an error of law. (Pl.'s Br. at 20-22).

Defendant argues that the ALJ's determination is supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 10-15) (Dkt. No. 12).  For the following reasons, this court agrees with the defendant and will order dismissal of the complaint.

## VII.  SEVERE IMPAIRMENT

### A.    Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL

2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by

itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.* The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

B.    **Application**

Although plaintiff's first argument states that the mental status findings of the

17

Appeals Council are inaccurate and beyond the scope of the evidence, the discussion of this claim must begin with the determination made by ALJ Koennecke in her March 18, 2011 opinion which was reversed by the District Court. In the 2011 decision, ALJ Koennecke found that plaintiff's mental impairment was not severe, but then erred in failing to "consider" the non-severe impairment when she was analyzing plaintiff's RFC.

As stated above, any error in the severity determination at step two would have been harmless if the ALJ had mentioned plaintiff's mental impairment in her step four determination. The District Court reversed because of this error. The court did ***not*** find that the ALJ's severity determination regarding plaintiff's mental impairment was not supported by substantial evidence. In fact, the court found that the ALJ properly considered the "special technique," and that her findings were supported by the record. (T. 685-87). Judge Sharpe stated that "[u]ltimately, substantial evidence supports the ALJ's determination that Johnson's mental impairment, GERD, and hand impairment were not severe." (T. 688). "Moreover, because the disability analysis continued, any error at step two is, at most, harmless." (*Id.*) (citing *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012)).

As stated above, the legal error, causing the remand of ALJ Koennecke's 2011 decision was her failure to "consider" plaintiff's non-severe mental impairment in her RFC determination at step four of the sequential analysis. (T. 688-91). ALJ Koennecke never even mentioned plaintiff's mental impairment in her 2011 RFC determination. Judge Sharpe stated that "[t]he ALJ's failure to consider Johnson's mental impairments

and abilities in assessing her RFC is legal error. Accordingly, the ALJ's decision is reversed and remanded." (T. 690-91). However, the term "consider" did not indicate that the ALJ was required to make any particular finding on remand, and Judge Sharpe did **not** imply that plaintiff's mental impairment would in any way affect or change the ultimate RFC determination.

On remand, ALJ Koennecke again found that plaintiff's mental impairments of anxiety and depression were not severe because they did not cause "more than minimal limitation in the claimant's ability to perform basic work activities." (T. 721-23). ALJ Koennecke reviewed the "special technique" and considered plaintiff's limitations in the four broad functional areas, known as the "paragraph B criteria."[15] (T. 722). The regulations provide that if "we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe." 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). If the impairment is found to be severe, then the ALJ will consider that impairment at step three and determine whether the severity is sufficient to meet the other criteria contained in the various Listed Impairments. 20 C.F.R. §§ 1520a(d)(2), 416.920a(d)(2).

---

[15] The "paragraph B" criteria are taken from the four broad functional areas set out in the disability regulations for evaluating mental impairments as stated in section 12.00C of the Listing of Impairments. (T. 722) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C). The evaluation of a claimant's limitations in the four functional areas is used to determine whether plaintiff's mental impairment is "severe" as well as whether the claimant's impairment meets the criteria for a Listed Impairment under step three of the disability analysis. 20 C.F.R. § 404.1520a(c)(3), 416.920a(c)(3). The four functional areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.*

On remand, ALJ Koennecke again found that plaintiff had no limitations in activities of daily living, mild limitations in social functioning, no limitations in concentration, persistence, or pace, and no episodes of decompensation. (T. 722). The Appeals Council agreed with this finding (T. 610), and this court finds that the Appeals Council's decision is supported by substantial evidence.[16] While plaintiff's physical impairments may cause some limitation of her daily activities, there is no indication in the record that plaintiff's *mental* impairments impose any such limitation.

As the ALJ pointed out, plaintiff lived alone, went shopping, handled all of her household chores, and was able to engage in other activities of daily living. The ALJ found that plaintiff's social functioning was only "mildly" limited by her mental impairments because she was able to go out, go shopping, attend college classes, and use public transportation. (T. 722). Plaintiff's concentration, persistence, or pace were not limited by her mental impairment.[17] Plaintiff was able to attend college and obtain a business certificate. Plaintiff's physicians assessed plaintiff's attention and concentration as normal. (*See e.g.* T. 1032 - on Nov. 9, 2011, plaintiff denied problems with concentration; T. 1038 - on June 21, 2011, Dr. Hall finds "normal attention span and concentration). There is no evidence that plaintiff had any episodes of decompensation. She had no psychiatric hospitalizations. Thus, the Commissioner

---

[16] The Appeals Council also noted that ALJ Gibbs determined that plaintiff's mental impairments were not severe in her December 2, 2013 decision, which the Appeals Council was reviewing at the same time as it was reviewing ALJ Koennecke's September 25, 2015 decision. (T. 610).

[17] In fact, plaintiff claimed that her physical impairment occasionally affected her concentration due to pain, but did not allege that her mental impairment affected her concentration at all.

properly found that plaintiff's mental impairment was not severe.

## VI.    RFC EVALUATION/CREDIBILITY

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations.
Ordinarily, RFC is the individual's maximum remaining ability to do sustained work
activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular
and continuing basis" means eight hours a day, for five days a week, or an equivalent
work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2
(N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)
(quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical
facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's
subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R
§§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)
(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must
specify the functions plaintiff is capable of performing, and may not simply make
conclusory statements regarding a plaintiff's capacities.  *Martone v. Apfel*, 70 F. Supp.
2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v.
Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460
(W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion,
describing how the evidence supports the ALJ's conclusions, citing specific medical

facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record

22

in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. § 416.929(c)(3).

## B.    Application

### 1.    Mental Impairment

On remand, ALJ Koennecke believed that the District Court had ordered her to find that plaintiff's mental impairment caused more limitations than she originally found.  In her September 15, 2015 decision, ALJ Koennecke stated that

> [t]he error identified by the District Court was a failure to consider non-severe mental limitations in the residual functional capacity found.  We have been instructed by the Agency that there should be no limit in the [RFC] found for a singular mental impairment that does not impose any limitations.  It is unclear how a mental impairment can be viewed in combination with the physical limitations since there are no mental limits.  However, I feel compelled by the Court's order to consider the non-severe mental impairment and [have] limited the claimant to unskilled mental demands to address any (unfounded) report of anxiety or workplace pressure issues.

(T. 726) (one parenthetical in original).  Because ALJ Koennecke made this determination, and plaintiff's previous work was semi-skilled, the ALJ was also compelled to find that plaintiff would be unable to perform her previous sedentary

23

work. (T. 726).  Based on the finding that plaintiff could not do her previous work and because she had other physical limitations on her ability to perform the full range of sedentary work, ALJ Koennecke considered the testimony of a VE, who determined that plaintiff could perform other "unskilled" sedentary work in the national economy. (T. 727-29).

The Appeals Council disagreed with ALJ Koennecke's finding that plaintiff's mental impairment would limit her to "unskilled" work.  Such a finding was also inconsistent with ALJ Gibbs's December 2, 2013 finding that plaintiff could perform her past relevant semi-skilled work.[18]  Essentially, the Appeals Council found that plaintiff's non-severe mental impairment placed such minor limitations on plaintiff's ability to work that notwithstanding the impairment, plaintiff was able to perform her prior work.  The Appeals Council stated that "her non-severe mental status results in a limitation that she is unable to perform complex tasks and duties, and that she retains the mental capacity to perform detailed work-related tasks and duties . . .  consistent with semi-skilled work." (T. 611).  Plaintiff argues that the Appeals Council erred in determining that plaintiff could perform her past relevant work.

The court finds that the Appeals Council determination is supported by substantial evidence.  Many of the medical records deal with plaintiff's severe physical impairments or a combination of the physical and mental impairments when being examined by her primary care providers.  However, during these examinations, plaintiff often "denied" depression and anxiety. (T. 493 -denies depression and emotional

---

[18] This finding related to the same or overlapping time periods.

24

problems (12/2009); 497- denies anxiety and depression (11/2009); 530 - denies depression (6/2010); 534- denies depression and anxiety (5/2010); 535 -denies depression (3/2010); 538- denies depression (1/2010); 585 - denies depression (8/2010); 1070, 1075, 1089 - denies depression and/or emotional problems (11/2011, 4/2012, 7/2012); 1095 - denies depression and anxiety (1/2011).

On March 3, 2011, plaintiff was examined at Faxton-St. Lukes Hospital Clinic by a treating physician assistant ("PA"), Monica Davis. (T. 1048-56). The reason for the examination is listed as a "f/u panic, anxiety." (T. 1048). During this examination, plaintiff complained of anxiety, but **denied** sense of great danger, mental problems and depression.[19] (T. 1050). PA Davis also noted that plaintiff was taking Seroquel at bedtime, which was "helping with sleep and anxiety." (*Id.*) PA Davis noted that plaintiff was alert, cooperative, had a normal mood and affect, normal attention and concentration, was pleasant, and well groomed. (*Id.*) Plaintiff had "good intellect and insight, but questionable compliance at times." (*Id.*) PA Davis also noted that plaintiff had a "PMHx"[20] which was "tumultuous and contributes to a FEAR affect most of the time 6/10." (*Id.*) She noted that MHC gave plaintiff a diagnosis of "GAD," Panic, and Agoraphobia 1/11. While plaintiff "appeared somewhat anxious, she was not hypervigilant, had no tremor, was "Rational 3/11," calm, and articulate. (*Id.*) PA Davis listed all of plaintiff's "Existing Problems" as "Improved." (*Id.*) There is no indication

---

[19] The court notes that on January 12, 2011, plaintiff told PA Davis that she did have a "sense of great danger and anxiety." (T. 1061).

[20] "PMHx" refers to "Past Medical History."

25

that plaintiff's mental impairment interfered with her ability to perform work-related functions.[21]

The record also contains plaintiff's mental health records. On January 6, 2011, Linda Troutman-Zellows, a Licensed Social Worker from Mental Health Connections ("MHC") wrote to Marjorie Bazan, RN from the Legal Aid Society. (T. 599). In the letter, LCSW Zellows explained that she met with plaintiff three times since September of 2010, and that although plaintiff had two psychiatric evaluations scheduled, she canceled them both, so she had never undergone an evaluation by a psychiatrist. LCSW Zellows then stated that plaintiff only attended eight out of fourteen appointments. (*Id.*) Although the "diagnosis" was "major depression with severe psychosis," at that time, there was no indication that a psychiatrist or any acceptable medical source made that diagnosis.

The record does contain a subsequent "Psychiatric Evaluation," which is signed by Dr. Stephen Hudyncia, M.D., dated February 11, 2011. (T. 1002-1003). Plaintiff's diagnosis was only "Depressive Disorder," and "Substance Abuse, in remission." (T. 1003). Dr. Hudyncia stated that plaintiff was polite, "relatively calm, and nonchalant with the interview." (*Id.*) She responded positively to questions, and there was no

---

[21] Plaintiff cites the one sentence in PA Davis's report which states that plaintiff's past medical history was "tumultuous" which contributed to a "FEAR affect" most of the time. Although it is unclear why the word "FEAR" is capitalized, the court notes that there are no examinations in which plaintiff's "affect" was listed as anything other than "normal," including in the same paragraph of PA Davis's report. (T. 1050). The court would also point out that, even though on January 12, 2011, plaintiff complained of a sense of great danger and anxiety, her physical examination states that she was alert, cooperative, had a normal mood and affect, appeared "somewhat anxious," but was not hypervigilant, had no tremor, and was rational. (T. 1061).

distress or anguish in her affect. She was "very relaxed," even when describing potentially troubling symptoms." (*Id.*) Dr Hudyncia stated that plaintiff presented "somewhat atypically." He stated that she was very isolated and felt "primarily sad and lonely," but it was "extremely difficult to make a case for any primary psychiatric condition at this time. It may be that she has partially treated depression." (*Id.*) There is no mention of "psychosis" in Dr. Hudyncia's report.

In addition, the MHC "pre-screening" report, dated June 10, 2010, written by a social worker, stated that plaintiff's Global Assessment of Functioning[22] Score was 55 (T. 1005). The pre-screening report also stated that plaintiff was "on waiting list for psychiatric eval." (*Id.*) However, in February of 2011, Dr. Hudyncia listed plaintiff's Axis V score as 70/70. (T. 1003). Psychiatric impairments are often recorded with a multi-axial evaluation system. DSM-IV-TR at 27-35. Axis V is the GAF described above. *Id.* at 32-34. "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning." *Id.* The GAF is listed as GAF on admission/GAF on discharge. *Id.* A score of 70/70 indicates that Dr. Hudyncia found that plaintiff had only "some mild symptoms," even though she had some depression and psychosocial stressors. This finding is entirely consistent with the Appeals Council assessment that

---

[22] The Global Assessment of Functioning ("GAF") is a 100 point scale. A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," and 61-70 indicates "some mild symptoms." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR"). However, the court must also note that the use of GAF scores is no longer favored, and this instrumentality has been eliminated from the current Diagnostic and Statistical Manual. *See Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 536 (S.D.N.Y. 2015) (noting that use of GAF has been eliminated, but given that the GAF scale was in use at the time that plaintiff was assessed, there was no error in the ALJ's reliance on the scores).

plaintiff's mental impairment would not affect her ability to perform semi-skilled work.

In her September 25, 2015 decision, ALJ Koennecke mentioned that "[d]uring any given encounter, mental health professionals have given the claimant various diagnoses and characterized her mental impairment in various ways." (T. 722). The ALJ then stated that "what the impairment is called is of no real consequence, rather how a given impairment affects mental functioning is the central inquiry under the Act." (*Id.*) The ALJ was correct. The MHC records also list plaintiff's impairment simply as "Depressive Disorder" and R/O Mood disorder. (T. 998). She was discharged from treatment in November of 2011 because she "did not return/was nonresponsive to outreach attempts." (T. 997).

Genuine conflicts in the evidence are for the Commissioner to resolve. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Thus, the Appeals Council properly resolved conflicts in the medical evidence of record, and its determination that plaintiff's non-severe mental impairment did not prevent plaintiff from performing detailed work-related tasks and duties, consistent with semi-skilled work, even though she might not be able to perform "complex" tasks and duties, was supported by substantial evidence.

### B.    Physical Impairments

ALJ Koennecke agreed that plaintiff experienced pain, and that her severe musculoskeletal impairments, including her symptoms, limited her to sedentary work at which she could alternate from sitting to standing at will, but found that the objective evidence did not support the level of severity alleged by plaintiff. (T. 723-24). The ALJ

noted that, even though plaintiff complained of pain, her treating sources consistently observed her with no spine deformities, no spine tenderness, no difficulty or problems with her gait, and full range of motion in her joints, with no sensory, motor, or neurological deficits.

On June 21, 2011, plaintiff's treating primary care physician, Dr. William Hall, M.D. stated that plaintiff "maintains good functionality, but because of pain is unable to work." (T. 1036). However, Dr. Hall also stated that plaintiff was "working with VESID to try and get back to some work."[23] (*Id.*) Dr. Hall's physical examination stated that the range of motion in plaintiff's back was "good," straight leg raising was 60 degrees bilaterally, but there was no atrophy, no focal deficits neurologically, and plaintiff had normal sensation, reflexes, coordination, muscle strength and tone. (T. 1038). In addition, in an RFC evaluation, dated June 25, 2010, signed by both Dr. Hall and Dr. Sajid Kahn, M.D.[24] "sedentary" was circled as the "category which best conforms to the patient's limitations if placed in a competitive work situation: (8 hrs day, 40 hrs per week), even though "less than sedentary" was also an option. (T. 1098). On the next page of the RFC evaluation, the doctors indicated that plaintiff would be absent about three times per month and would have to "lie down at unpredictable intervals during a work shift." (T. 1098-99). If this were true, the VE testified that plaintiff would not be able to perform any competitive work. (T. 646 - not more than

---

[23] "VESID" stands for Vocational and Educational Services for Individuals with Disabilities. Currently VESID is known as "ACCES-VR." http://www.nybi.org/acces-vr.html.

[24] Plaintiff was referred to Dr. Sajid Kahn in 2008 for "pain management." (T. 329-31).

one absence per month would be tolerated, and more than 15% off-task would not be tolerated in a work environment).

The treating physicians were asked to explain the statements in his RFC evaluation in a document entitled "Request for Clarification on Musculoskeletal Questionnaire." (T. 1097).  Dr. Hall submitted the competed "clarification." (*Id.*)  His response to the question about plaintiff having to "lie down" at unpredictable intervals was that "[t]his is part of therapy and our medical advice when having more than her constant low back pain that can be unpredictable during her day." (*Id.*)

The ALJ specifically considered Dr. Hall's and Dr. Kahn's assessment, together with Dr. Hall's "clarification." (T. 726).  The ALJ read the clarification and determined that "some weight" would be given to these treating physicians, but that their statements regarding the side effects of medications and the requirement of lying down at unpredictable intervals were "pertaining to people generally and not this specific individual." (T. 726).  Dr. Hall stated that depression and anxiety as well as pain medication are "well-known to impact one's ability to concentrate and attend." (T. 1097).  This statement does not indicate that plaintiff is specifically affected in this way.  In addition, the ALJ is correct when she states that there was no indication in any of the doctors' contemporaneous progress notes that he advised plaintiff to "lie down" during the day.

On December 8, 2009, plaintiff saw Dr. Kahn for "severe low back pain, radiating to plaintiff's left leg and ankle." (T. 493).  However, upon physical examination, Dr. Kahn found normal reflexes and 5/5 strength in her arms and legs.

Sensation was intact, and her gait was normal. (T. 494). Straight leg raising was negative bilaterally, and her spinal range of motion, including flexion, extension, lateral bending, and rotation were "slightly limited with pain." (*Id.*) There was "mild tenderness" of the paraspinal muscles on both sides. (*Id.*) Patrick's[25] test did reveal pain in her lower lumbar spine, and a lumbar facet loading test was positive bilaterally. (*Id.*)

On June 4, 2010, Dr. Kahn continued to find only mild tenderness in plaintiff's paraspinal muscles. (T. 531). Straight leg raising was negative, and her range of motion was only "slightly" limited with pain. (*Id.*) The same findings were made in September of 2010 when Dr. Nathaniel Gould, M.D. signed a report authored by PA Rebecca Hosey in which she found that plaintiff's gait was normal, she had mild to moderate tenderness in her low back, but her range of motion was only "slightly" limited by pain. (T. 578). She was able to walk on her heels and toes. (*Id.*) On August 9, 2010, Dr. Kahn stated that plaintiff could stand and walk without motor weakness or instability. (T. 583). Dr. Kahn made the same physical findings in January and March of 2010. (T. 536, 539). In March of 2012, Dr. Hall stated that he had not seen plaintiff since "last June," and that she was at his office for new pain medication and an update on her disability forms. (T. 1024). Plaintiff told Dr. Hall that she was walking twice a week for exercise. (T. 1026). Although Dr. Hall did not mention plaintiff's back or knees in this examination, he did note that plaintiff was in no acute distress, and neurologically,

---

[25] Patrick's Test is a test to determine the presence or absence of sacroiliac disease. http://medical-dictionary.thefreedictionary.com/Patrick+test.

she had normal sensation, reflexes, muscle strength and tone. (*Id.*)

The Appeals Council also adopted ALJ Koennecke's credibility determination, finding that the plaintiff's subjective complaints were "not fully credible." (T. 611). The ALJ's credibility determination is supported by substantial evidence. ALJ Koennecke modified the sedentary RFC by providing that plaintiff could sit or stand at will, which would take into account plaintiff's complaints of pain and inability to sit for long periods of time. Plaintiff argues that the ALJ should have specified how frequently plaintiff would be able to alternate positions. (Pl.'s Br. at 17-18). Plaintiff argues that the "RFC assessment . . . must be specific as to the frequency of the individual's need to alternate sitting and standing." (*Id.*) (citing POMS DI 25015.020 and SSR 96-9p).

However, the cases cited by plaintiff involve situations in which the court held that the ALJ should have consulted "a vocational resource to determine whether the individual can make an adjustment to other work." (Pl.'s Br. at 18) (citing SSR 96-9p). In this case, the ALJ did consult a VE to determine whether plaintiff could perform her previous work or any other work in the national economy. Plaintiff argues that the ALJ "agreed" with the VE, who testified that plaintiff could not perform her prior work. However, the reason that the VE found that plaintiff could not perform her prior work was not based on the necessity to alternate positions, but was because the ALJ's hypothetical limited plaintiff to "unskilled/lower level semi-skilled" work because of

her mental impairment.[26] (T. 641). The Appeals Council rejected that finding and determined that plaintiff could mentally perform semi-skilled work, consistent with her previous work experience. Thus, the VE's statement that plaintiff could not perform her previous work is no longer valid. It is true that the VE never specifically discussed plaintiff's previous job in relation to the ability to alternate positions because the VE was already beyond that determination when the ALJ asked about the sit/stand requirement. The only reason that the VE was no longer considering plaintiff's previous work was the ALJ's inappropriate limitation to unskilled work.[27]

In any event, the court must point out that, even assuming that plaintiff's previous work would not have allowed her to alternate sitting and standing, the VE testified that plaintiff would be able to perform three different unskilled/lower level semi-skilled jobs at which she would be allowed to alternate between sitting and

---

[26] At the September 1, 2015 hearing, the ALJ told the VE that the past relevant work was an insurance customer representative and an office clerk. (T. 640). The ALJ then asked a hypothetical question, based on an individual who could physically perform sedentary work (with no requirement of alternating positions), and who could perform "unskilled" or lower level semi-skilled work. (T. 640). The VE initially stated that this person could perform both past relevant jobs, until the ALJ reminded the VE that the customer service representative job had an SVP of 4 (semi-skilled). Then the VE answered that the SVP of 4 would take the past relevant work out. (T. 641). The VE then proposed three unskilled/lower level of semi-skilled jobs that plaintiff could perform, and also testified that there would be "tolerance in those jobs . . . for someone changing from sitting to standing when they want to, assuming they remain on task." (T. 642). The ALJ then specified that the "person would be able to change from a sitting to a standing [sic] every hour." (*Id.*) The VE answered that "every hour would be reasonable." At the supplemental hearing, the VE testified that even though the three jobs that she proposed were "lower level semi-skilled" jobs, an individual who was limited to "simple" tasks would still be able to perform the work. (T. 652). The VE testified that if the individual were "off task" for 30% of the time, then no work was possible. (T. 653). The ALJ and the Appeals Council rejected any finding that plaintiff would be off task for that amount of time during the day.

[27] The court assumes that if plaintiff can perform her previous semi-skilled work, she could also perform the unskilled jobs that were listed by the VE.

33

standing every hour. The ultimate result of the ALJ's decision would have been the same even if plaintiff could not perform her prior relevant work. Given the evidence in the record, any error in this regard would have been harmless. *See Hawkey v. Commissioner of Soc. Sec.*, No. 5:15-CV-996, 2016 WL 6833059, at *4 (N.D.N.Y. Oct. 24, 2016) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (administrative legal error is harmless when the same result would have been reached had the error not occurred).

## VII. <u>FAILURE TO DEVELOP THE RECORD</u>

### A. **Legal Standards**

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete. *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (although an ALJ's obligation to develop the record is heightened where the claimant appears pro se, the duty still exists even where the claimant is represented by counsel during the administrative proceedings); 20 C.F.R. §§ 404.1512(d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008) (citing *Devora v.

*Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y.2002)).

In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[28] Although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79, n. 5 (2d Cir. 1999).

## B.     Application

Plaintiff's last argument is that the ALJ failed to "develop or consider" the record. Plaintiff appears to argue that some of the records from the December 2, 2013 ALJ's decision do not appear in the transcript or note "different dates for medical records, with different amounts of pages within the exhibits attached." (Pl.'s Br. at 21). Plaintiff argues that the record on remand was "developed" with additional medical records, "yet these appear not to have been considered." (*Id.*) (citing T. 957-1099). There is no indication that the Appeals Council failed to consider the record at T. 957-1009. The Appeals Council cited the evidence that it considered in the first part of its decision and the records at T. 957-1099 were cited therein. (T. 609). The fact that all

---

[28] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The version of the regulations in effect when the ALJ adjudicated plaintiff's disability claim should be applied, pursuant to *Lowry v. Astrue*, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) .

the records were not mentioned in the subsequent analysis does not indicate that the Appeals Council failed to consider the evidence. *See Burgess v. Colvin*, No. 15-CV-9585, 2016 WL 7339925, at *10 (S.D.N.Y. Dec. 19, 2016) (ALJ need not mention every item of testimony presented or explicitly reconcile every conflicting shred of medical evidence) (quoting *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam)).

As an example, the ALJ specifically considered Dr. Hall's September 5, 2014 explanation of the Musculoskeletal Questionnaire, signed by treating physicians Hall and Kahn, when determining what weight to give the treating physicians' assessment. (T. 726) (citing T. 1097). The ALJ noted that "[o]n September 5, 2014, Drs. Khan and Hall provided a statement explaining their rationale for the limitations opined above (Exhibit B37F). However, this statement represents a statement pertaining to people generally and not this specific individual. Further it is not supported by objective findings of record for this particular claimant." (T. 726). The Appeals Council adopted the ALJ's findings regarding everything except limitations imposed by plaintiff's mental impairment and added the limitation with respect to a sit/stand option. Thus, it is clear that the Commissioner did consider the exhibits cited by plaintiff's counsel.[29]

Plaintiff argues that the exhibit pages do not match. However, plaintiff does not cite to any information that is contained in the allegedly missing pages that would

---

[29] The court notes that the original questionnaire was signed by Dr. Kahn, but not dated, and was signed by Dr. Hall on June 25, 2010 and also appears much earlier in the transcript. (T. 546-47, 1098-99). The "explanation" of the responses in the questionnaire, signed by Dr. Hall only, was dated in 2014 and only appears at the end of the transcript. (T. 1097).

change the ALJ's or the Appeals Council's opinion. In fact, the Appeals Council noted that plaintiff was given the opportunity to submit additional evidence in addition to "comments." (T. 609). The Appeals Council decision states that "[c]omments were received and considered. (*Id.*) If plaintiff believed that evidence was missing, or that the ALJ did not consider the appropriate evidence, plaintiff had the opportunity to submit it to the Appeals Council. The Commissioner accepted the fact that plaintiff is in pain. However, based on the medical reports, including the more recent records, and plaintiff's stated activities,[30] the ALJ and the Appeals Council did not believe that plaintiff was as limited as she alleged.[31] Essentially, the Commissioner was presented

---

[30] The ALJ noted plaintiff lived alone, handled her own household chores, went shopping, and even walked to a hearing. (T. 725). As of June 2009, plaintiff was a student, studying accounting, and any accommodations were minimal. In November of 2009, her "occupation" was listed as student, and in 2010, she attended a community college to obtain a certificate in "office practices." (*Id.*) In February 2010, plaintiff reported that she did not have time to do her exercises more than once a day (*see* T. 524), and she reported working part-time after the alleged onset date and going to VESID to try to obtain work. (T. 725) (*see* T. 1036). The ALJ recognized that the level of work plaintiff performed did not rise to the level of substantial gainful activity, but her ability to work, even part-time was indicative that the symptoms and her daily activities were not as restricted "at least at times, as she alleged. (T. 725). The ALJ also noted that plaintiff traveled to visit her family out of state for the holidays and temporarily left the area to assist her daughter with her health problems. The ALJ stated that the travel was inconsistent with plaintiff's stated inability or reluctance to leave her home or to be around other people. (*Id.*) These statements by the ALJ are supported by the record. The court also notes that on March 5, 2010, plaintiff told Dr. Kahn that she had difficulty walking and sitting due to pain, and that she was doing physical therapy, but had not noticed any improvement yet. (T. 535). Dr, Kahn's physical examination of the same day showed only a "slightly limited" range of motion in her lower back and mild tenderness. (T. 536). On March 8, 2010, she told her physical therapist that "her legs are feeling stronger," and the physical therapist reported that plaintiff's range of motion and strength improving and that the "pain decreased overall." (T. 520). This statement was inconsistent with what she told Dr. Kahn three days before, but consistent with Dr. Kahn's physical examination.

[31] Counsel argues that plaintiff had "side effects" from medications and plaintiff testified to such side effects at the hearing. However, on May 8, 2009 and December 8, 2009, plaintiff "denie[d] any side effects from the medications." (T. 291, 493). On August 3, 2010, plaintiff told PA Hosey that although she was taking Percocet for pain, "[s]he denies side effects." (T. 585). On March 1, 2011, plaintiff was prescribed Seroquel to help her sleep. (T. 1054). She was told to call if there were any

with conflicting evidence, which is for the Commissioner to resolve. *See Veino v. Barnhart*, *supra.* Where there is substantial evidence to support either position, the determination is to be made by the fact finder. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (citation omitted).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk is directed to file a **JUDGMENT FOR DEFENDANT.**

Dated: January 11, 2017

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

---

side effects from the Seroquel. (T. 1055). On March 17, 2011, PA Davis noted that the Seroquel was helping with both sleep and anxiety, with no mention of side effects. (T. 1050). PA Davis's assessment was that plaintiff's sleep disorder was "improved," her "malaise and fatigue" were "improved," and her anxiety was "improved." (T. 1050). Plaintiff was given a shot of B12 vitamin and reported that she felt less fatigued after the first shot. (T. 1048). On April 17, 2010, plaintiff told Dr. Michael McNulty that she took Meloxicam "once in a while," and that it cause nausea. (T. 1074). She also stated that she "tried" Darvocet, percocet, and oxycodone in the past which caused nausea. (T. 1074). However, as stated above, when she was taking the Percocet, she denied side effects. (T. 585).